IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

OPTIMORPHIX, INC.,

    *Plaintiff,*

    v.

AKAMAI TECHNOLOGIES, INC.,

    *Defendant*.

Civil Action No. 24-1336-MN

JURY TRIAL DEMANDED

### [PROPOSED] SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

OptiMorphix, Inc. ("OptiMorphix" or "Plaintiff") brings this action and makes the following allegations of patent infringement relating to U.S. Patent Nos.: 7,099,273 (the "'273 Patent"); 9,275,167 (the "'167 Patent"); 10,412,388 (the "'388 Patent"); 9,894,361 (the "'361 Patent"); 9,936,040 (the "'040 Patent"); and 9,167,021 (the "'021 Patent") (collectively, the "patents-in-suit").  Defendant Akamai Technologies, Inc. ("Akamai" or "Defendant") infringes the patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq*.

### THE PARTIES

1. Plaintiff OptiMorphix, Inc. ("Plaintiff" or "OptiMorphix") is a Delaware corporation that holds a portfolio of over 250 patent assets that were developed at Citrix Systems, Inc. ("Citrix") and Bytemobile, Inc.

2. Bytemobile, Inc. ("Bytemobile") was a global leader in mobile internet solutions for network operators.  The company was founded in 2000.  Bytemobile's mission was to optimize video and web content services for mobile network operators to improve users' experiences while maximizing the efficiency of network infrastructure.

3.      Bytemobile was established during a time when the mobile landscape was evolving rapidly.  The advent of 3G technology, coupled with increasingly sophisticated smartphones, led to a surge in demand for data services.  However, mobile networks at the time were not optimized to handle this influx, particularly for data-rich services like video streaming.  Recognizing this opportunity, Bytemobile sought to create solutions that would enable network operators to deliver high-quality, consistent mobile data services.  By 2011, Bytemobile was a "market leader in video and web optimization, with more than 125 cumulative operator deployments in 60 countries.[1]



Andrew Zipern, *Vodafone in Deal with Start-Up Bytemobile,* NYTimes at C4 (January 29, 2002) ("Bytemobile, a wireless data start-up . . . reached a deal with Vodafone, Britain's largest mobile phone operator"); *NTT DoCoMo Launches Bytemobile Optimization Solution in its Core Network,* WIRELESSWATCH IP (October 5, 2004) ("NTT DoCoMo has deployed Bytemobile's optimization solution in its core network"); *China Mobile Selects Bytemobile for Nationwide Web Gateway Project,* BUSINESS WIRE (July 8, 2009) ("A Bytemobile customer since 2004, CMCC has deployed its web optimization solutions"); *Bytemobile Juices Up Orange,* ESPICOM TELECOMMUNICATION NEWS (October 10, 2002) ("Orange customers will experience faster application performance and Web page downloads"); *ByteMobile Wins 2013 LTE Award for Best LTE Traffic Management Product,* MARKETSCREENER (July 1, 2013) ("ByteMobile technology has been deployed . . . in networks serving nearly two billion subscribers.").

---

[1] *Bytemobile: Importance of Video and Web Optimizations*, TELECOM REVIEW at 58 (2011); *see also Bytemobile Secures Its 36th Video Optimisation Win for MNO Deployment,* TOTAL TELECOM & TOTAL TELECOM MAGAZINE (March 21, 2011).

4.    Bytemobile products, such as the Unison platform and the T3100 Adaptive Traffic Manager, were designed to optimize mobile data traffic in real-time, ensuring a high-quality mobile internet experience for end-users.  This approach was groundbreaking at the time and set the stage for many of the mobile data optimization techniques used today.

5.    Bytemobile's innovative technologies and customer-centric approach led to rapid growth and success.  Bytemobile's innovative product portfolio included: the T3100 Adaptive Traffic Manager which was designed to handle high volumes of traffic efficiently and provide real-time optimization, compression, and management of mobile data; Bytemobile's T2000 Series Video Cache, which supported transparent caching of content; and Bytemobile's T1000 Series Traffic Director, which enabled traffic steering and load balancing for high availability of applications.



*Bytemobile Adaptive Traffic Management Product Family*, BYTEMOBILE DATA SHEET at 1-2 (2014).

6.      Bytemobile's groundbreaking technologies also included products for data optimization.  Bytemobile's data optimization solutions were designed to compress and accelerate data transfer.  By reducing the size of data packets without compromising quality, these technologies allowed faster data transmission and minimized network congestion.  Bytemobile also offered solutions to analyze and manage network traffic, allowing network operators to identify patterns, allocate bandwidth intelligently, and prioritize different types of content.



Spencer E. Ante, *Wringing Out More Capacity*, WALL STREET JOURNAL at B3 (March 19, 2012) (emphasis added).

7.      In July 2012, Bytemobile was acquired by Citrix Systems, Inc. ("Citrix") for $435 million.  Bytemobile "became part of [Citrix's] Enterprise division and extend[ed] [Citrix's] industry reach into the mobile and cloud markets."[2]

8.      OptiMorphix owns a portfolio of patents developed at Bytemobile and later Citrix. Highlighting the importance of the patents-in-suit is the fact that the OptiMorphix's patent portfolio has been cited by over 4,800 U.S. and international patents and patent applications assigned to a wide variety of the largest companies operating in the networking, content delivery, and cloud computing fields.  OptiMorphix's patents have been cited by companies such as:

---

[2] CITRIX SYSTEMS, INC. 2012 ANNUAL REPORT at 33 (2013).

- Amazon.com, Inc. (263 citing patents and applications)[3]
- Oracle (59 citing patents and applications)[4]
- Alphabet, Inc. (103 citing patents and applications)[5]
- Broadcom Ltd. (93 citing patents and applications)[6]
- Cisco Systems, Inc. (277 citing patents and applications)[7]
- Lumen Technologies, Inc. (77 citing patents and applications)[8]
- Intel Corporation (45 citing patents and applications)[9]
- Microsoft Corporation (150 citing patents and applications)[10]
- AT&T, Inc. (93 citing patents and applications)[11]
- Verizon Communications, Inc. (31 citing patents and applications)[12]
- Juniper Networks, Inc. (29 citing patents and applications)[13]

9.      Defendant Akamai Technologies, Inc. is a Delaware corporation with its principal place of business at 145 Broadway, Cambridge, Massachusetts 02142.  Akamai may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

<center>**JURISDICTION AND VENUE**</center>

10.      This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

11.      This Court has personal jurisdiction over Akamai in this action because Akamai has committed acts within the State of Delaware giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not

---

[3] *See e.g.*, U.S. Patent Nos. 7,817,563; 9,384,204; 9,462,019; 11,343,551; and 11,394,620.
[4] *See e.g.,* U.S. Patent Nos. 7,475,402; 7,574,710; 8,589,610; 8,635,185; and 11,200,240.
[5] *See e.g.,* U.S. Patent Nos. 7,743,003; 8,458,327; 9,166,864; 9,665,617; and 10,733,376.
[6] *See e.g.,* U.S. Patent Nos. 7,636,323; 8,448,214; 9,083,986; 9,357,269; and 10,091,528.
[7] *See e.g.,* U.S. Patent Nos. 7,656,800; 7,930,734; 8,339,954; 9,350,822; and 10,284,484.
[8] *See e.g.,* U.S. Patent Nos. 7,519,353; 8,315,179; 8,989,002; 10,511,533; and 11,233,740.
[9] *See e.g.,* U.S. Patent Nos. 7,394,809; 7,408,932; 9,515,942; 9,923,821; and 10,644,961.
[10] *See e.g.,* U.S. Patent Nos. 8,248,944; 9,071,841; 9,852,118; 10,452,748; and 11,055,47.
[11] *See e.g.,* U.S. Patent Nos. 8,065,374; 8,429,302; 9,558,293; 9,800,638; and 10,491,645.
[12] *See e.g.,* U.S. Patent Nos. 8,149,706; 8,930,559; 9,253,231; 10,003,697; and 10,193,942.
[13] *See e.g.,* U.S. Patent Nos. 8,112,800; 8,509,071; 8,948,174; 9,407,726; and 11,228,631.

offend traditional notions of fair play and substantial justice.  Akamai, directly and/or through subsidiaries or intermediaries (including distributors, retailers, and others), has committed and continues to commit acts of infringement in this District by using products and services that infringe the patents-in-suit.  Moreover, Akamai actively directs its activities to customers located in the State of Delaware.

12.     The Court further has personal jurisdiction over Akamai because it is organized and existing under the laws of the State of Delaware and maintains a registered agent in Delaware.

13.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).  Defendant is organized and existing under the laws of the State of Delaware.

<div align="center">

**THE ASSERTED PATENTS**

</div>

**U.S. PATENT NO. 7,099,273**

14.     U.S. Patent No. 7,099,273 (the "'273 Patent") entitled, *Data Transport Acceleration and Management Within a Network Communication System,* was filed on January 29, 2002.  The '273 Patent is subject to a 35 U.S.C. § 154(b) term extension of 1,021 days.  The '273 Patent claims priority to U.S. Provisional Patent Application No. 60/309,212 filed on July 31, 2001, and U.S. Provisional Patent Application No. 60/283,542 filed on April 12, 2001.  A true and correct copy of the '273 Patent is attached hereto as Exhibit 1.

15.     The '273 Patent has been in full force and effect since its issuance.  OptiMorphix, Inc. owns by assignment the entire right, title, and interest in and to the '273 Patent.

16.     The technologies disclosed in the '273 Patent improve the efficiency and speed of data transmission within network communication systems.  The '273 Patent introduces methods and apparatuses that enhance data transport, especially in environments where network conditions

are variable or unpredictable and "provide systems and method for data transport acceleration and management within a network communication system." '273 Patent, col. 3:31-33.

17.    The '273 Patent is directed to solving the problem of inefficient data transport within network communication systems.  This inefficiency can lead to poor utilization of network resources, increased latency, and reduced overall performance.

18.    The '273 Patent identifies the shortcomings of the prior art.  Specifically, the specification describes that traditional methods of data transport in network communication systems often fail to efficiently manage and accelerate data transport, especially in environments with variable or unpredictable network conditions.  These methods may not adequately handle network congestion, leading to poor utilization of network resources, increased latency, and reduced overall performance.  "This bursty nature of data transmission may under-utilize the available bandwidth on the downlink channel, and may cause some applications requiring a steady flow of data, such as audio or video, to experience unusually poor performance."  '273 Patent, col. 2:1-6.

19.    "Typical [Transport Control Protocol (TCP)] flow control mechanisms … utilize an acknowledgment-based approach to control the number and timing of new packets transmitted over the communication network."  '273 Patent, col. 1:41-44.

20.    Under TCP systems that were conventional in 2001, a sender maintained a congestion window and the sender transmitted additional packets only when acknowledgments were received.  This meant the packet transmission timing was driven by incoming acknowledgments rather than an independent transmission control mechanism.

21.     The '273 Patent identifies several shortcomings of the prior art, particularly in the context of the Transport Control Protocol (TCP) which is commonly used in modern data communication networks.  The patent specification describes that:

> Many of the problems associated with conventional TCP architectures stem from the flow control, congestion control and error recovery mechanisms used to control transmission of data over a communication network.

'273 Patent, col. 1:38-41.

22.     Conventional TCP architectures assume that the network employs symmetric communication channels that enable data packets and acknowledgements to be equally spaced in time.  *See* '273 Patent, col. 1:53-56.  This assumption often does not hold true in networks that employ asymmetric uplink and downlink channels, such as wireless communication networks.  Bursty data transmission might result in the inefficient use of the available bandwidth on the downlink channel, leading to suboptimal performance in applications that need a consistent data flow, such as those involving audio or video.  *See* '273 Patent, col. 2:1-6 ("This bursty nature of data transmission may under-utilize the available bandwidth on the downlink channel, and may cause some applications requiring a steady flow of data, such as audio or video, to experience unusually poor performance.").

23.     This burstiness was particularly harmful to streaming video and audio, real-time communications, and wireless networks.

24.     Another shortcoming identified is that conventional TCP architectures react to both random loss and network congestion by significantly and repeatedly reducing the congestion window, which can lead to significant and potentially unjustified deterioration in data throughput.  *See* '273 Patent, col. 2:43-47 ("the congestion avoidance and error recovery mechanisms assumes that packet loss within the communication network was caused by congestion, rather than a temporary degradation in the signal quality of the communication channel.").  This is particularly

problematic in wireless and other bandwidth constrained networks where random packet loss due to fading, temporary degradation in signal quality, signal handoffs or large propagation delays occur with relatively high frequency.

25.    The '273 Patent also points out that conventional TCP congestion control mechanisms tend to exhibit sub-optimal performance during initialization of data connections over reduced-bandwidth channels, such as wireless links.  When a connection is initiated, the congestion control mechanism aggressively increases the size of the congestion window until it senses a data packet loss.  This process may adversely impact other connections that share the same reduced-bandwidth channel as the connection being initialized attempts to maximize its data throughput without regard of the other pre-existing connections.  This can lead to inefficient use of resources with decreased overall throughput.

26.    The '273 Patent teaches the use of various techniques to accelerate and manage data transport in network communication systems.  These techniques include the use of congestion control mechanisms, timers, and other methods to optimize data transmission.  By implementing these techniques, the patent aims to improve the efficiency of data transport, particularly in environments with variable or unpredictable network conditions.  This can lead to better utilization of network resources, reduced latency, and improved overall performance.  The inventions disclosed in the '273 Patent provide significant benefits and improvements to the function of the hardware in a computer network.

27.    The methods claimed in the '273 Patent were designed to solve specific networking problems that existed in prior art TCP implementations, including bursty data transmission caused by delayed acknowledgments (ACKs) caused by TCP's acknowledgment-driven model.

28. The '273 Patent introduces a timer-based mechanism for controlling the rate at which data packets are transmitted between a sender and a receiver. Instead of transmitting packets in response to acknowledgements as in conventional TCP architectures, the disclosed methods transmit packets based on expiration of a transmit timer. The specification explains that "instead of the acknowledgment-based flow control typically implemented within TCP architectures, embodiments of the present invention utilize a transmit timer … to provide timer-based flow control of data transmitted by the server." '273 Patent, col. 7:55-59.

29. In the technology disclosed in the '273 Patent, the transmission rate is controlled by a transmit timer rather than by the arrival pattern of acknowledgment signals. Claim 1 recites "transmitting additional data packets to the receiver in response to expiration of a transmit timer, the period of the transmit timer based on the round trip time measurements and the congestion window parameter." The '273 Patent specification further explains that the transmit timer period may be determined "by the ratio of the smoothed round trip time and the smoothed congestion window." '273 Patent, col. 7:64–65. Rather than clocking packet transmissions off arriving ACKs, the '273 patent specification teaches calculating a pacing rate that governs the inter-packet transmission schedule. By determining the packet transmission rate from filtered measurements of round trip time and the congestion window rather than from the arrival pattern of acknowledgments, the '273 Patent teaches a "better measurement of network congestion" and network bandwidth and avoids the bursty transmission patterns associated with conventional acknowledgment-driven TCP flow control. '273 Patent, col. 8:1–3.

30. The methods claimed in the '273 Patent improve the efficiency of packet transmission by coordinating the transmission of new packets and retransmitted packets using the transmit timer. As described in the specification, the transmit timer "controls both retransmission

of lost data packets … and transmission of new data packets." '273 Patent, col. 16:34-38. This mechanism allows retransmitted packets and newly transmitted packets to be multiplexed through a unified transmission schedule, improving fairness and utilization of available bandwidth.

31.     These techniques represent a technological improvement over conventional TCP implementations that existed at the time of the inventions claimed in the '273 Patent. Conventional TCP flow control mechanisms relied primarily on acknowledgment-driven packet transmission and did not employ timer-based pacing mechanisms that dynamically adjusted transmission intervals based on smoothed network measurements. By replacing the conventional acknowledgment-driven transmission model with a timer-driven model that incorporates smoothed round-trip-time measurements and congestion window calculations, the claimed methods provide a more stable and efficient mechanism for controlling data transport in computer networks.

32.     The methods disclosed in the '273 Patent therefore improve the functioning of network communication systems themselves. By reducing bursty packet transmission, improving responsiveness to changing network conditions, and providing more accurate congestion detection, the claimed techniques enhance the performance of network hardware and software that implement TCP communications. These improvements enable more efficient use of available network bandwidth, reduce latency in data transmission, and improve performance for applications that rely on consistent data delivery, including multimedia streaming and other real-time communication services.

33.     On March 8, 2024, Unified Patents, LLC filed a Request for *Ex Parte* Reexamination of the '273 Patent with the United States Patent and Trademark Office. The Patent Office entered an Order Granting *Ex Parte* Reexamination of the '273 Patent on April 29, 2024.

On September 11, 2024, the Primary Examiner assigned to the Reexamination of the '273 Patent issued an Order confirming the patentability of all claims of the '273 Patent. On November 14, 2024, the United States Patent and Trademark Office issued *Ex Parte* Reexamination Certificate No. 12770 confirming the patentability of Claims 1-15 of the '273 Patent. A true and correct copy of that Certificate is attached hereto as Exhibit 2.

34.    The '273 Patent family has been cited by 1,466 United States and international patents and patent applications as relevant prior art. Specifically, patents issued to the following companies and research institutions have cited the '273 Patent family as relevant prior art:

- Cisco Technology, Inc.
- Qualcomm Incorporated
- International Business Machines Corporation
- Intel Corporation
- Microsoft Corporation
- Broadcom Corporation
- Google Inc.
- AKAMAI Networks, Inc.
- Adobe Systems Incorporated
- Apple Inc.
- Lumen Technologies, Inc
- Oracle Corporation
- Amazon.com, Inc.

**U.S. PATENT NO. 9,275,167**

35.    U.S. Patent No. 9,275,167 (the "'167 Patent") entitled, *Content Adaptation*, was filed on May 14, 2012. The '167 Patent claims priority to U.S. Provisional Patent Application No. 11/636,033, which was filed on December 8, 2006. The '167 Patent is subject to a 35 U.S.C. § 154(b) term extension of 607 days. A true and correct copy of the '167 Patent is attached hereto as Exhibit 3.

36.    The '167 Patent has been in full force and effect since its issuance. OptiMorphix, Inc. owns by assignment the entire right, title, and interest in and to the '167 Patent.

Page 12 of 59

37. The '167 Patent is directed to solving the problem of efficient data management in a distributed storage system. In distributed storage systems, data is spread across multiple nodes, which can be geographically dispersed. This presents challenges in terms of ensuring data availability, redundancy, and efficient retrieval. The '167 Patent addresses these shortcomings in existing systems by providing methods and systems that can manage data in a distributed storage system more effectively.

38. The '167 Patent identifies the shortcomings of the prior art. The specification describes that traditional methods of data management in distributed storage systems often suffer from inefficiencies and limitations. For instance, they may not provide sufficient data redundancy, which can lead to data loss if a node fails. Additionally, they may not distribute data evenly across the nodes, leading to some nodes being overloaded while others are underutilized. Furthermore, data retrieval can be slow and inefficient in these systems.

39. The inventions taught by the '167 Patent solves discrete, technological problems associated with computer systems, specifically those related to data management in distributed storage systems. These are technical problems because they involve the design and operation of computer systems, including how data is stored, distributed, and retrieved in a network of computers.

40. The claims of the '167 Patent are directed to specific technological solutions for processing and adapting webpages so that they can be efficiently delivered to and rendered on mobile devices. The specification explains that mobile browsing systems faced numerous technical limitations, including "long download times," "lack of accessibility," "lack of performance," and "lack of usability." '167 Patent, col. 1:34-36.

41.     The specification of the '167 Patent further explains that mobile devices were often unable to properly render modern webpages because of "the inability of WAP 2.0 browsers to render rich HTML content; the lack of plug in support for rich multi-media content; and the lack of support for DHTML websites." '167 Patent, col. 1:38-42.

42.     The '167 Patent specification further identifies that mobile network environments presented technical networking constraints such as "large latency in wireless networks," "discrepancies between uplink and downlink bandwidth," and limitations in existing TCP protocol. '167 Patent, col. 1:42-44.  These problems were specific to computer networking systems and mobile device rendering environments.

43.     The asserted claims of the '167 Patent address these technological problems through a specific computer architecture that processes webpage response data before it is delivered to a mobile device.  For example, the system architecture disclosed in the specification includes an optimization server configured to communicate with mobile devices and content servers.  The specification explains that the system can include "a user agent 102, a client device 104, a gateway 106, one or more networks 108, 112, an optimization server 110, a storage device 114, and one or more content servers 116-118." '167 Patent, col. 2:26-29.

44.     The specification further explains that the optimization server includes specialized functional components including "a request monitor 210, a content cache 220, a response monitor 230, an adaptor 240, and interfaces 250, 260." '167 Patent, col. 3:30-32.  These components cooperate to process webpage response data and adapt that data so that it can be efficiently delivered to a mobile device.

45.     Consistent with this architecture, independent Claims 1 and 14 (and the claims depending therefrom) of the '167 Patent require that the optimization server receive response data

corresponding to the request data transmitted from a mobile device and adapt the response data based on identification data describing the mobile device.  The specification explains that request data can include identification data describing the device and user agent, which is used to retrieve adaptation parameters describing the properties of the mobile device.

46.    The specification explains that these adaptation parameters may include device-specific constraints such as "screen width," "screen height," "markup language," "maximum bytes per page," "maximum images per page," and other device-specific characteristics.  '167 Patent, col. 4:59-5:33.

47.    The asserted claims further require identifying content sections during traversal of a Document Object Model ("DOM") representing the webpage.  The specification explains that the optimization server parses the webpage into a data structure and that "[b]ecause HTML tags can be nested, this data structure is likely to be in the form of a tree."  '167 Patent, col. 5:52-53.

48.    The '167 Patent explains that the optimization server traverses the DOM tree structure to identify content sections that can be manipulated and adapted for the mobile device. Specifically, the specification explains that the system "identifies sections of related content in the original DOM tree to allow advanced content manipulation."  '167 Patent, col. 14:34-36.

49.    The asserted claims also include specific rules for classifying HTML elements during pagination and adaptation.  For example, Claims 2 and 15 require classification of HTML elements into categories such as grouping elements, ignored elements, and simple elements.  The specification explains that these classifications determine how nodes in the DOM tree are processed and whether a node should be included in a content section.

50.    The '167 Patent's specification explains that HTML elements may be classified into "three main groups: (1) grouping elements, such as <table> or <div> tags, that impose specific

layout or structure to the content, (2) ignored elements that do not provide any useful content; and (3) simple elements … that represent content or non-layout inducing markup." '167 Patent, col. 14:21-31.

51.     The asserted claims also include technological mechanisms for identifying content sections using geometric properties of nodes within the DOM tree.  The specification explains that the system determines whether a node should be treated as a content section "based on the geometric information (or box model[width, height]) of a node." '167 Patent, col. 14:44-47.  These geometry-based techniques allow the system to determine how proportions of a webpage should be grouped and adapted for mobile rendering.

52.     Independent Claims 1 and 14 (and the dependent claims therefrom) of the '167 Patent also include serialization of the adapted DOM into adapted markup language source code. The specification explains that serialization converts the adapted DOM tree structure into HTML text suitable for transmission to the mobile device.  *See* '167 Patent, col. 20:13-15.

53.     The claims of the '167 Patent further require constructing an adapted webpage for delivery to the mobile device.  The specification explains that the system constructs adapted webpages and sub-pages so that the resulting pages "fit the small screen of a mobile device" and "fit in the available memory of the mobile device." '167 Patent, col. 14:5-11.

54.     Dependent Claims 12, 25, and 28 of the '167 Patent also include specific techniques for flattening webpage structures and removing layout-imposing markup tags so that oversized webpage elements can be displayed on small screens.  The specification explains that flattening involves "deconstructing a portion of HTML that renders an area too wide for the target handset into smaller pieces." '167 Patent, col. 16:56-61.

55.     The '167 Patent specification also describes alternative techniques for preserving layout when webpage structures already fit within the device screen.  In such cases, the system can preserve the layout by copying the relevant DOM sub-tree and grouping elements into the adapted DOM.  '167 Patent, col. 16:46-55.

56.     At the time of the invention of the '167 Patent, it was not well-understood, routine, or conventional to perform webpage adaptation using the specific combination of techniques disclosed and claimed in the '167 Patent, including DOM traversal to identify content sections, classification of HTML elements into structural categories, geometry-based detection and content sections, transformation of a first DOM into a second DOM based on device adaptation parameters, preservation of tab box structures, serialization of the adapted DOM, and construction of mobile-optimized webpages and sub-pages.

57.     The '167 Patent family has been cited by 539 United States and international patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies and research institutions have cited the '167 Patent family as relevant prior art:

- Cisco Systems, Inc.
- Microsoft Corporation
- International Business Machines Corp.
- Amazon.com, Inc.
- Alphabet Inc.
- Meta Platforms, Inc.
- Apple Inc.
- Broadcom Limited
- Xerox Corporation
- Samsung Electronics Co., Ltd.
- AT&T Inc.
- NEC Corporation
- Telefonaktiebolaget LM Ericsson
- Verizon Communications Inc.
- Qualcomm, Inc.
- Brunoco, Inc.
- Nokia Corporation

- LG Electronics Inc.
- Adobe Inc.
- Oracle Corporation
- Fujitsu Limited

**U.S. PATENT NO. 10,412,388**

58.    U.S. Patent No. 10,412,388 (the "'388 Patent") entitled, *Framework for Quality-Aware Video Optimization*, was filed on January 8, 2018.  The '388 Patent claims priority to U.S. Patent Application No. 12/751,951, which was filed on March 31, 2010, and which claims priority to U.S. Provisional Patent Application No. 61/165,224, which was filed on March 31, 2009.  A true and correct copy of the '388 Patent is attached hereto as Exhibit 4.

59.    The '388 Patent has been in full force and effect since its issuance.  OptiMorphix, Inc. owns by assignment the entire right, title, and interest in and to the '388 Patent.

60.    The '388 Patent generally relates to a method and system for quality-aware video optimization.  It teaches receiving an encoded video frame, decompressing it, extracting a first quantization parameter (QP), and acquiring a delta QP based on the first QP.  The method also includes acquiring a second QP based on the delta QP and the first QP, compressing the decompressed video frame based on the second QP, and providing the compressed video frame.  The process allows for fine control of quality degradation in byte-reduced content and can be applied to transcoding scenarios where the input and output compression formats are different.

61.    The '388 Patent identifies the shortcomings of the prior art.  Specifically, existing single-pass rate control techniques had a problem in that the relationship between the compressed byte size of a video frame and its quantization parameter were only known after the frame is encoded.  This made it challenging to achieve byte reduction and controllable quality degradation in a single pass.

62.     The '388 Patent teaches the use of a quality-aware video optimization technique that modifies a video frame sequence to reduce the byte size while limiting perceptual quality degradation to a controllable level.

63.     The inventions disclosed in the '388 Patent provide significant benefits and improvements to the function of hardware in a computer network by enabling efficient video optimization. The method allows for single-pass, on-the-fly quality-aware optimization, making it well-suited for various environments, including live video feeds and storage arrays.

64.     The asserted claims of the '388 Patent are directed to a specific technological way of processing encoded video frames using concrete video-encoding inputs and outputs, not merely to the goal of reducing bitrate while preserving quality. The claims require identifying a first quantization parameter previously used to encode a decoded frame, determining a delta quantization parameter as a function of that first quantization parameter, determining a second quantization parameter based at least on the first quantization parameter and the delta quantization parameter, and then encoding the decoded frame using the second quantization parameter.

65.     The '388 Patent specification describes a concrete technological architecture for carrying out those claimed operations. In particular, the disclosed "video optimizer 108 may include, among other things, a decoder 210, a QP adjustment module 220, and an encoder 230." '388 Patent, col. 4:34-35. The '388 Patent further explains that "de-quantizer 212 can extract $QP_{Input}$ from the decompressed video frame, and forward the $QP_{Input}$ to QP adjustment module 220," after which the encoder and quantizer use the derived output quantization parameter to recompress the video frame. '388 Patent, col. 4:49-52. These disclosures describe a specific video-processing pipeline using identified modules and frame-level quantization data, rather than a result divorced from implementation.

66. The '388 Patent further discloses a particular relationship between the previously used quantization parameter and the newly determined quantization parameter. The specification explains that "[t]hese observations lead to a novel function, F, defining $\Delta QP$ according to the value of $QP_{Input}$" and that "[t]his relationship between $\Delta QP$ and $QP_{Input}$ can be written as, for example: $\Delta QP=F(QP_{Input})$." '388 Patent, col. 5:44-48. The patent further explains that the function may be implemented as "a mapping table between $QP_{Input}$ and $\Delta QP$" or "derived from a database containing, for example, a mapping between $QP_{Input}$ and $\Delta QP$." '388 Patent, col. 5:49-55. This is a concrete, frame-processing rule for deriving a new quantization control input from an identified prior encoding parameter.

67. The asserted claims of the '388 Patent are further grounded in specific threshold-based technical behavior. The '388 Patent explains that "when the $QP_{Input}$ is low or below a predetermined threshold, QP adjustment module 220 can select a positive $\Delta QP$," and that when "the $QP_{Input}$ [is] high or above a predetermined threshold . . . QP adjustment module 220 can select a negative $\Delta QP$." '388 Patent, col. 5:56-6:7. The '388 Patent specification further explains that this threshold-based behavior reflects two different technical operating regions of the QP-bitrate curve and permits the optimizer to respond differently to frames depending on how they were originally encoded. Asserted Claims 5, 6, 15, and 16 expressly recite these threshold-based implementations.

68. The '388 Patent also discloses that the claimed optimization is tied to specific codec-aware video processing rather than generalized data handling. The '388 Patent explains that "the quantization settings indexed by a given QP value can be different for each video codec," and further teaches that, where the input and output codecs differ, the optimizer can "convert $QP_{Input}$ from the decoder's QP scale to the encoder's QP scale before a $\Delta QP$ can be computed." '388

Patent, col. 1:37-39; *id.*, col. 7:4-9.  The '388 Patent explains that this can be done by "maintaining a mapping between QP scales for each combination of decoder and encoder that the quality-aware video optimizer supports."  '388 Patent, col. 7:4-12.  These disclosures confirm that the invention claimed in the '388 Patent operates in the technical context of codec-specific quantization scales and encoded-frame transcoding.

69.    The '388 Patent also teaches additional concrete control over video-quality degradation through a machine-applied offset parameter.  The specification states that "QP adjustment module 220 can also acquire a quality degradation offset, which is a parameter indicating an amount of quality degradation, to control quality degradation during the optimization of the decompressed video frame."  '388 Patent, col. 6:13-17.  It further discloses the revised function "$\Delta QP=F(QP_{Input})+D$," where "$D$ is a parameter indicating the amount of quality degradation."  '388 Patent, col. 6:27-33.  Asserted Claims 9 and 19 recite this additional technological feature for controlling the amount of degradation introduced during re-quantization.

70.    The '388 Patent additionally teaches that the disclosed approach can preserve the quality of already-low-quality frames while still reducing overall byte size across a sequence.  The specification explains that, when $QP_{Input}$ is high, the optimizer may choose a negative $\Delta QP$ and derive "a $QP_{Output}$ value lower than the $QP_{Input}$ to retain the original perceptual quality of the input video frame, while only inflating the byte size marginally."  '388 Patent, col. 6:4-7.  The '388 Patent further explains that "[w]hen a normal video frame sequence . . . including frames of various qualities is optimized with this method, the net byte reduction can be positive."  '388 Patent, col. 6:7-10.  This reflects a specific technical approach to frame-by-frame optimization that accounts for differing initial frame conditions rather than applying a uniform compression rule.

71.     The asserted claims are directed to a particular ordered set of frame-processing operations.  For example, asserted Claim 1 requires first identifying the quantization parameter previously used to encode a decoded frame, then determining delta quantization as a function of that parameter, then determining a second quantization parameter based at least on those values, and then encoding the decoded frame using the second quantization parameter.  The asserted system claims recite corresponding configured device components.  That ordered combination of steps is directed to a particular technological solution in digital video processing.

72.     The '388 Patent further alleges specific technical benefits from the claimed architecture.  It explains that the video optimizer "can perform single-pass, on-the-fly, quality-aware optimization to a previously encoded video frame sequence," and that because "the video optimization method only requires one pass over the video frame sequence, video optimizer 108 is well suited to operate in a wide variety of environments."  '388 Patent, col. 3:48-63.  The '388 Patent specification specifically identifies technical deployment scenarios including optimizing "live video feeds before they traverse a low-capacity network segment" and optimizing surveillance video "before it is archived."   '388 Patent, col. 3:66-4:4.  These are concrete improvements in the operation of computer-based video delivery and storage systems.

73.     The claimed use of previously used frame-level quantization information, the claimed function mapping $QP_{Input}$ to $\Delta QP$, the threshold-based positive-versus-negative delta behavior, the codec-aware quantization-scale handling, and the claimed quality degradation offset were not conventional, routine, or well-understood at the time of the '388 Patent.  The patent itself characterizes the function F defining $\Delta QP$ according to $QP_{Input}$ as "novel" ('388 Patent, col. 5:44-48), and describes the disclosed approach as addressing a known shortcoming in prior single-pass rate control systems.

74.     The '388 Patent family has been cited by 30 United States and international patents and patent applications as relevant prior art.   Specifically, patents issued to the following companies and research institutions have cited the '388 Patent family as relevant prior art:

- Interdigital, Inc.
- Tencent Holdings Ltd
- Microsoft Corporation
- Qualcomm, Inc.
- Lattice Semiconductor
- Openwave Mobility, Inc.
- Samsung Electronics Co., Ltd.
- Beijing Dajia Interconnection Information Technology Co., Ltd.

**U.S. PATENT NO. 9,894,361**

75.     U.S. Patent No. 9,894,361 (the "'361 Patent") entitled, *Framework for Quality-Aware Video Optimization,* was filed on March 31, 2010.  The '361 Patent claims priority to U.S. Provisional Application No. 61/165,224, which was filed on March 31, 2009.  The '361 Patent is subject to a 35 U.S.C. § 154(b) term extension of 1,038 days.  A true and correct copy of the '361 Patent is attached hereto as Exhibit 5.

76.     The '361 Patent has been in full force and effect since its issuance.  OptiMorphix, Inc. owns by assignment the entire right, title, and interest in and to the '361 Patent.

77.     The '361 Patent relates to a method and system for quality-aware video optimization.   Specifically, it teaches receiving an encoded video frame, decompressing it, extracting a first quantization parameter (QP), and acquiring a delta QP based on the first QP.  The method further includes acquiring a second QP based on the delta QP and the first QP, compressing the decompressed video frame based on the second QP, and providing the compressed video frame. The process is designed to reduce the byte size of the video stream as much as possible while limiting perceptual quality degradation to a controllable level.

78.     The '361 Patent is directed to solving the problem of optimizing video quality in a way that balances the reduction of byte size with the preservation of perceptual quality.  This involves a nuanced understanding of how quantization parameters (QPs) affect both the perceptual quality and the bitrate of a video frame, and how to manipulate these QPs to achieve the desired balance.

79.     The '361 Patent identifies the shortcomings of the prior art.  Specifically, existing single-pass rate control techniques had a problem in that the relationship between the compressed byte size of a video frame and its quantization parameter was only known after the frame was encoded.  This made it challenging to achieve byte reduction and controllable quality degradation in a single pass.

80.     The '361 Patent teaches the use of a quality-aware video optimization technique that requires only a single pass over the previously encoded video frame sequence to optimize the video frame sequence.  It introduces a novel function that defines $\Delta QP$ according to the value of QPInput, allowing fine control of quality degradation in the byte-reduced content.  It also considers differences between input and output compression formats (codecs) and computes codec adjustment that accounts for these differences.

81.     The inventions disclosed in the '361 Patent provide significant benefits and improvements to the function of hardware in a computer network by enabling efficient video optimization.  By allowing for single-pass, on-the-fly, quality-aware optimization, the patent's methods can be applied in various environments, including optimizing live video feeds before they traverse a low-capacity network segment, or optimizing surveillance video before archiving, thus saving storage space and network bandwidth.

82.    The asserted claims of the '361 Patent recite a specific technological process that uses concrete information from previously processed frames in the same video sequence to control recompression of a current frame.  In particular, the asserted claims require "acquiring an inflation adjustment based on a comparison between total byte size of frames previously decompressed and total byte size of the frames after being previously compressed," and then acquiring a second QP based on that inflation adjustment together with the first QP and delta QP.

83.    The '361 Patent explains the technical problem addressed by those limitations.  It states that where previously encoded input frames have high $QP_{Input}$ values, the optimizer may choose negative $\Delta QP$ values to preserve perceptual quality, but "the negative $\Delta QP$ values and low $QP_{Output}$ values can inflate the byte size of the video stream."  '361 Patent, col. 9:34-38.  The '361 Patent further explains that, "[a]lthough the degree of the byte size inflation would be small, it is usually not desirable to increase the byte storage requirement of the video stream."  '361 Patent, col. 9:35-38.  Thus, the asserted claims address a concrete recompression-side technical problem arising inside computerized video-processing systems.

84.    To solve that problem, the '361 Patent discloses a specific feedback mechanism implemented within the video optimizer.  The specification states that "inflation prevention module 710 can utilize a compensation function that takes into consideration the total byte size of at least some video frames encoded thus far and the total byte size of at least some video frames decoded thus far." '361 Patent, col. 9:39-46.  It further explains that the compensation function "can output a positive value to compensate for the byte size inflation," and that the module can "further adjust the $\Delta QP$ value based on byte size inflation adjustment . . . to preserve the original perceptual quality of the input video frames while avoiding or minimizing byte size inflation." '361 Patent, col. 9:50-57.

85.    The '361 Patent likewise describes this inflation-prevention mechanism in concrete operational terms.  The '361 Patent teaches that, "[f]or each video frame to be encoded, the $\Delta QP$ can be calculated as, for example: $\Delta QP=F(QP_{Input})+D+C(InputBytes, OutputBytes)$," where "C is the compensation function."  '361 Patent, col. 9:58-66.  The specification further states that "InputBytes represents the total byte size of at least some frames previously decoded for a video stream currently being processed," and "OuputBytes represents the total byte size of at least some frames previously encoded for the video stream currently being processed." '361 Patent, col. 9:66-10:5.  These disclosures are directed to specific implementations of computerized processing of video-frame sequence data.

86.    The asserted claims of the '361 Patent also recite a concrete machine architecture for performing that work.  Claims 13–21 require, among other things, "a decoder," "an inflation prevention module," "a QP adjustment module," and "an encoder," configured to perform the claimed frame-processing operations.  The specification describes "decoder 210," "QP adjustment module 220," "inflation prevention module 710," and "encoder 230" as components of "an exemplary quality-aware video optimizer 108." '361 Patent, col. 4:27-29.  These limitations are directed to a specific arrangement of processing components operating on encoded video frames.

87.    The '361 Patent specification also discloses that the inflation-prevention mechanism works together with other concrete codec-processing operations when the input and output compression formats differ.  It states that the optimizer may "convert the first QP from an input QP scale into an output QP scale" based on "a mapping between the input QP scale and the output QP scale," and then use the converted QP together with the other claimed inputs to obtain the second QP.  These disclosures are required by asserted Claims 2-3 and 15-16.  The asserted claims therefore recite specific codec-aware quantization processing.

Page 26 of 59

88.     These asserted claims are directed to a particular technological improvement in computerized video recompression: using prior-sequence byte-size feedback to compensate for inflation that otherwise arises when attempting to preserve perceptual quality in already heavily quantized video.   The '361 Patent claims a particular way of calculating and applying recompression control values in a video-optimizer pipeline using specific frame-level and sequence-level inputs.

89.     The inflation-adjustment mechanism, including the use of prior decompressed-versus-recompressed byte-size comparisons, historic sequence data, codec-scale conversion, and the recited decoder / QP adjustment module / inflation prevention module / encoder architecture, claimed in the '361 Patent was not conventional, routine, or well understood when the '361 Patent was invented.  The '361 Patent itself describes this as an optimizer configuration that compensates for byte-size inflation introduced during optimization while preserving perceptual quality, and thus plausibly alleges a non-conventional technical improvement.

90.     The '361 Patent family has been cited by 30 United States and international patents and patent applications as relevant prior art.   Specifically, patents issued to the following companies and research institutions have cited the '361 Patent family as relevant prior art:

- Interdigital, Inc.
- Tencent Holdings Ltd
- Microsoft Corporation
- Qualcomm, Inc.
- Lattice Semiconductor
- Openwave Mobility, Inc.
- Samsung Electronics Co., Ltd.
- Beijing Dajia Interconnection Information Technology Co., Ltd.

**U.S. PATENT NO. 9,936,040**

91.     U.S. Patent No. 9,936,040 (the "'040 Patent") entitled, *Systems and Methods of Partial Video Caching*, was filed on December 19, 2014. The '040 Patent is subject to a 35 U.S.C. § 154(b) term extension of 336 days. A true and correct copy of the '040 Patent is attached hereto as Exhibit 6.

92.     The '040 Patent has been in full force and effect since its issuance. OptiMorphix, Inc. owns by assignment the entire right, title, and interest in and to the '040 Patent.

93.     The '040 Patent relates to systems and methods for caching and keying segments for efficient data retrieval. The '040 Patent outlines a technical framework that stores a set of instructions for acquiring, storing, and managing segments of data (e.g., video, image, and audio files) in response to requests generated by client devices. This framework is designed to optimize the delivery of content over networks by reducing the amount of data that needs to be transmitted from content servers to client devices, thereby decreasing network congestion and improving the efficiency of content delivery.

94.     The '040 Patent is directed to solving the problem of high network congestion and inefficient use of network resources caused by the delivery of large content files over the Internet. This issue places a substantial processing load on the network infrastructure and web servers, particularly affecting networks employing wireless technology, which generally offer lower throughput and suffer from greater packet loss and location-dependent throughput variations compared to wired networks.

95.     The '040 Patent identifies the shortcomings of the prior art by highlighting the inefficiencies in existing methods of content delivery. The specification describes that traditional methods do not adequately address the challenges of real-time streaming adjustments, such as bitrate and frame resolution changes, especially in formats like MPEG-4 Part 14 (MP4), which

require advance transmission of index data. This limitation significantly constrains the ability to adjust the bitrate in real-time, leading to inefficient use of network resources and a degraded user experience.

96.     The '040 Patent teaches the use of a cache server to store segments of data associated with user requests. This approach involves acquiring segments from a content server, storing these segments if they meet certain criteria (e.g., exceeding a threshold value), and generating keys for efficient retrieval. By caching only parts of the media data that are likely to be requested again, the system reduces the need for repeated data transmissions from the content server, thereby alleviating network congestion and improving content delivery efficiency.

97.     The inventions disclosed in the '040 Patent provide significant benefits and improvements to the function of the hardware in a computer network by optimizing the delivery of data. This is achieved through a reduction in the amount of data that needs to be transmitted across the network, which not only decreases network congestion but also minimizes the processing load on network infrastructure and web servers. As a result, the network and server capacity can be utilized more effectively, enabling a larger number of users to be served with electronic data without necessitating a proportional increase in network or server resources.

98.     The inventions taught by the '040 Patent solve discrete, technological problems associated with computer systems and networks, particularly those related to the efficient delivery and caching of large amounts of data. These problems are inherently technical because they involve optimizing network resource usage, reducing bandwidth consumption, and improving the scalability of content delivery systems. The solutions provided by the '040 Patent address these challenges by introducing innovative methods for partial caching and content delivery

optimization, which are crucial for enhancing the performance and reliability of modern computer networks.

99.     The asserted claims of the '040 Patent are directed to specific computer-implemented methods for organizing and retrieving segmented media within a cache server using segment keys and set entries that associate related segments of the same media object.  For example, the asserted claims require generating "a key for each segment" and generating "a first set entry that includes a first set key for the one or more segments associated with the first request." '040 Patent, Claim 14.

100.    The '040 Patent specification explains that the cache server uses a particular data structure in which each cache entry contains a key, media content, and associated metadata.  As described in the specification, "the cache server data structure can be comprised of a series of entries, wherein each entry further comprises a key, media content, e.g., a segment, and metadata associated with the media content."  '040 Patent, col. 7:51-55.  Groups of related entries are combined into a set so that related segments can be retrieved and managed together.

101.    The '040 Patent further describes that sets of segments are organized using a set key and associated metadata.  For example, the specification explains that "[a] set can comprise a key and metadata associated with the segments," and that the metadata may include information such as the timing of each segment within the media object, the URL address for each segment, and the quality of each segment.  '040 Patent, col. 7:61-65.  The asserted claims are directed to generating and maintaining this structured relationship between segments and sets.

102.    The asserted claims of the '040 Patent further recite specific computer-implemented logic for determining whether segments associated with later requests should be associated with previously stored segments or instead stored in a newly generated set.  For

example, Claim 16 recites determining whether segments associated with a second request are associated with segments from a first request, updating the existing set entry if such association exists, and generating a new set entry if such association does not exist.

103.    The '040 Patent specification describes this association logic in technical terms.  It explains that segments may be considered similar based on their timing within the same media object and that the cache server may determine similarity "by searching the set keys and set metadata."  '040 Patent, col. 11:60-63.  The asserted claims implement this determination to control whether an existing set is updated or a new set is created.

104.    The '040 Patent specification further explains that when later segments are sufficiently related to previously stored segments, the system updates the existing set.  For example, it describes that "segments $S_8$ and $S_9$ can be added to the same set as segments $S_1$-$S_3$" and that "a new set key … is generated for the set and the set metadata … is updated."  '040 Patent, col. 9:9-17.  The asserted claims recite this same technological update mechanism.

105.    Conversely, when later segments are not sufficiently related to previously stored segments, the system generates a new set entry and a new set key.  The specification describes that a new set may be created when segments are not sufficiently similar or are viewed less frequently. The asserted claims recite this same conditional generation of new set entries.

106.    The asserted claims also include threshold-based admission logic controlling which segments are stored in the cache.  For example, Claim 15 recites storing segments if a property of the segments exceeds a threshold.  The specification explains that such thresholds may include metrics such as whether a segment "has been viewed a predetermined number of times," such as "10,000 views in the past week" or an average number of daily views exceeding a defined value. '040 Patent, col. 11:27-32.

107.    The methods claimed in the '040 Patent also include specific mechanisms for determining whether requested segments are already stored in the cache server and for selectively retrieving missing segments from a content server when they are not present in the cache.  The specification explains that the optimization server can determine whether a requested segment is stored in the cache by comparing a generated key for the requested segment to the key field within each cache entry.  *See* '040 Patent, col. 12:47-58.

108.    When a requested segment is present in the cache, the cache server provides that segment to the optimization server.  When the requested segment is not present, the optimization server acquires the segment from the content server and provides it to the client device.  *See* '040 Patent, col. 12:54-62.  The asserted claims recite this selective retrieval architecture.

109.    The '040 Patent specification further explains that the claimed protocol enables partial reuse of cached media segments when later requests include segments that were previously cached.  For example, when a request includes segments $S_1$–$S_9$ and segments $S_1$–$S_3$ are already stored in the cache, those segments can be retrieved directly from the cache while only the missing segments are retrieved from the content server.  '040 Patent, col. 9:55-61.

110.    The asserted claims also encompass protocols in which cached segments may be optimized or modified by an optimization server before delivery to client devices.  Claims 19–22 recite storing optimized or modified segments and generating keys and set entries for those optimized or modified segments.

111.    The '040 Patent specification explains that optimized segments may be stored as separate cache entries and that different quality versions of segments may be stored simultaneously.  For example, the specification describes storing versions of segments in original,

low, medium, and high quality formats and distinguishing those versions using quality indicators appended to the segment key.  '040 Patent, col. 13:25-29; *id.*, col. 13:58-67.

112.    The '040 Patent specification explains that this key-based differentiation allows the cache server to recognize the quality level associated with stored segments and determine whether a requested version of the segment is available.  '040 Patent, col. 14:1-5.

113.    These claimed protocols for organizing, associating, retrieving, and optimizing segmented media within a cache server were not merely routine or conventional uses of generic computer components.  Rather, the '040 Patent specification describes a specialized cache architecture involving segment-level keys, set-level keys, association logic between requests, selective retrieval of missing segments, and storage of optimized segment variants.

114.    The '040 Patent family has been cited by 26 United States and international patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies and research institutions have cited the '040 Patent family as relevant prior art:

- Cisco Systems, Inc.
- Comcast Corporation
- EchoStar Corporation
- Salesforce, Inc.
- Telefonaktiebolaget Lm Ericsson
- Tencent Holdings Ltd.
- Hughes Network Systems, LLC
- Verizon Digital Media Services Inc.

## U.S. PATENT NO. 9,167,021

115.    U.S. Patent No. 9,167,021 (the "'021 Patent") entitled, *Measuring Web Browsing Quality of Experience in Real-Time at An Intermediate Network Node*, was filed on March 30, 2012.  The '021 Patent is subject to a 35 U.S.C. § 154(b) term extension of 265 days.  A true and correct copy of the '021 Patent is attached hereto as Exhibit 7.

116.    The '021 Patent has been in full force and effect since its issuance.  OptiMorphix, Inc. owns by assignment the entire right, title, and interest in and to the '021 Patent.

117.    The '021 Patent is directed to solving the problem of accurately measuring the time needed to download a web page at an intermediate network node.  Traditional methods of measuring download time at the client or server level are straightforward, but complications arise when content for a single web page is distributed across several physical servers or when measuring at an intermediate network node.  The patent addresses these challenges by introducing a method to evaluate and compute the page unit time.

118.    The '021 Patent identifies the shortcomings of the prior art.  Specifically, measuring the web page download time at an intermediate network node is practically not feasible due to the complexity of web page transactions.  The prior art lacks an effective method to measure the time taken to download a complete web page at an intermediate network node, especially when content is distributed across several servers or when dynamic URLs are generated by client-side scripts.

119.    The '021 Patent teaches the use of a method that includes acquiring current HTTP transactions, determining their relation to web browsing for a specific client, and evaluating whether they belong with the previous transactions set.  By grouping transactions into page units and computing a page unit time, the method provides a way to measure the Quality of Experience (QoE) of web browsing in real-time at an intermediate network node.

120.    The inventions disclosed in the '021 Patent provide significant benefits and improvements to the function of the hardware in a computer network by enabling real-time measurement of web browsing QoE at an intermediate network node.  This allows service providers to optimize network performance and take actions to enhance the browsing experience.

121.   The inventions taught by the '021 Patent solve discrete, technological problems associated with computer systems and network performance.  Specifically, it addresses the technical challenges of measuring web browsing Quality of Experience (QoE) at an intermediate network node, considering the complexities of web page transactions, distributed content across servers, and dynamic URL generation.  The solution provided by the '021 Patent is rooted in technological innovation and contributes to the optimization of network performance and user experience.

122.   The asserted claims of the '021 Patent recite specific computer-implemented techniques for processing network traffic at the HTTP transaction level, including filtering transactions for web-browsing relevance, associating transactions with a specific client, evaluating whether a current transaction belongs with a previous transactions set, and creating a boundary of a "page unit" for computing a page unit time.

123.   The '021 Patent specification explains that, at an intermediate network node, "each HTTP transaction is treated as an independent unit and the number of transactions that belong to the same web page may vary significantly." '021 Patent, col. 5:52-55.  The '021 Patent further explains that a simple page may involve only a few HTTP transactions, while a more complex page may involve a significantly larger number of transactions.  The asserted claims are directed to a specific technical solution for handling that variability in network traffic.

124.   The asserted independent claims require concrete protocol-aware processing steps, including "acquiring a current Hypertext Transfer Protocol (HTTP) transaction," "determining whether the current HTTP transaction relates to web browsing," "acquiring a previous transactions set of a specific client," "evaluating whether the current HTTP transaction belongs with the previous transactions set," and then either adding the transaction to the set or "creating a boundary

of a page unit." These are specific operations performed on HTTP transaction data, not generalized results.

125.    The '021 Patent specification describes concrete filtering mechanisms based on HTTP metadata available at the network node. It explains that filtering can be based on "the user agent of the HTTP protocol," "the Multipurpose Internet Mail Extensions (MIME) type of the content from the server," and other information in the HTTP transaction. '021 Patent, col. 5:16-39. The '021 Patent also discloses specific examples of content types associated with web pages, including "text/html," "application/xhtml+xml," "image/*," "text/javascript," "application/x-javascript," and "text/css." '021 Patent, col. 11:34-57.

126.    The asserted claims of the '021 Patent also require a specific timing-based association mechanism. Asserted Claims 6, 20, and 34 require "computing a time gap between the current HTTP transaction and the previous transactions set," determining whether that time gap satisfies a predefined timing threshold condition, and associating the current transaction with the previous set if the threshold is satisfied. This is a specific algorithmic technique for grouping transactions at the network node.

127.    The asserted claims of the '021 Patent further include concrete heuristics for determining whether a prior transactions set qualifies as a page unit. Asserted Claims 7, 8, 21, 22, 35, and 36 require determining whether the previous transactions set is a page unit and, in certain claims, determining whether the previous transactions set includes at least one HyperText Markup Language ("HTML") object.

128.    The specification explains why those heuristics are technologically meaningful. It states that "[h]aving an HTML object within a transaction set likely indicates that the transaction set is associated with a web page," while "a transaction set without an HTML object likely

indicates that the transaction set is not associated with a web page." '021 Patent, col. 12:20-24. The '021 Patent also discloses additional threshold-based criteria, including the size of the largest HTML object, number of images, total number of objects, and total download time. '021 Patent, col. 12:37-13:30.

129.    The asserted claims claim a specific, ordered manner of processing HTTP transactions using client-specific grouping, timing thresholds, predefined protocol-metadata filters, and page-unit boundary creation to generate a page-unit-time metric at a location in the network where direct page-boundary reconstruction was not feasible.

130.    The asserted apparatus claims of the '021 Patent are likewise directed to a particular technical architecture. Asserted Claims 28-36 and 42-43 recite apparatuses for page-unit detection that include a "packet processor," a "transaction filter," and a "page unit detector," each configured to carry out particular functions on HTTP transaction data.  Those claims are tied to a disclosed network-side implementation for processing packet traffic and HTTP metadata in real time.

131.    The specification of the '021 Patent describes a corresponding technical arrangement in which a "packet processing module" handles packets between client devices and content servers, an "HTTP processing and filtering module" parses HTTP requests and response headers and filters transactions, and a "page unit detection and web QoE score measurement module" processes filtered HTTP transactions in real time. '021 Patent, col. 4:7-5:60.  This disclosed architecture is consistent with the structure recited in the asserted apparatus claims.

132.    Asserted Claims 14, 28, and 42 of the '021 Patent disclose an additional technical refinement directed to correcting inaccuracies caused by the non-linear relationship between page-unit time and object count.  The specification explains that page-unit time "may exhibit a non-

linear relationship with the number of objects in the HTTP transactions in the page unit" and that this "can lead to inaccurate measurements of web QoE score." '021 Patent, col. 7:40-63.

133.   To address that technical problem, the '021 Patent discloses a particular normalization technique using a first average page unit time for a fixed number of objects, a second average page unit time for the same number of objects as in the measured page unit, and a normalized page unit time computed from those values.  The specification further teaches that those averages may be determined based on a "sliding time window." '021 Patent, col. 8:53-62. Asserted Claims 14, 28, and 42 therefore recite a specific data-processing method for compensating for object-count effects.

134.   The '021 Patent also discloses that the client identity used in the claimed grouping process can be obtained through concrete network-side mechanisms, including the source IP address of the request, the destination IP address of the response, "special HTTP headers (e.g., x-forwarded-for)," "RADIUS feeds," "PCRF servers," and "Subscriber Profile Repositories." '021 Patent, col. 9:44-55.  This confirms that the asserted claims are grounded in concrete network technology and packet-processing realities.

135.   At the time of the alleged invention, it was not well-understood, routine, or conventional to implement the particular ordered combination recited in the asserted claims at an intermediate network node, including: filtering HTTP transactions based on predefined user-agent, response-code, or content-type sets; associating transactions with a specific client; computing time gaps relative to previous transaction sets; creating page-unit boundaries based on those computations; and, for certain asserted claims, computing normalized page-unit times using stored average measurements and a sliding time window.

136.     The '021 Patent itself supports that those claimed techniques were not routine.  It explains that it was "practically not feasible to accurately measure the time taken to download a complete web page at an intermediate network node," and then discloses the claimed page-unit framework as a specific way to overcome that technical limitation.  '021 Patent, col. 1:46-58.

137.     The asserted claims of the '021 Patent are directed to specific improvements in network-side processing of HTTP transaction data and in the operation of systems that monitor web-browsing performance, and they recite inventive concepts that were not merely conventional at the time of the invention.

138.     The '021 Patent family has been cited by 17 United States and international patents and patent applications as relevant prior art.  Specifically, patents issued to the following companies and research institutions have cited the '021 Patent family as relevant prior art:

- BT Group plc
- Meta Platforms, Inc.
- Cisco Systems, Inc.
- Telefonaktiebolaget Lm Ericsson
- Tencent Holdings Ltd
- Apple Inc.
- Nippon Telegraph & Telephone Corp.
- EchoStar Corporation
- Intel Corporation

<div align="center">

**COUNT I**
**INFRINGEMENT OF U.S. PATENT NO. 7,099,273**

</div>

139.     Plaintiff references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

140.     Akamai tested and used in the United States products comprising systems and methods for data transport acceleration and management within a network communication system.

141.    Akamai tested and used Akamai Products and Services that use TCP-BBR congestion control, including the content delivery network ("CDN") platform (the "Akamai '273 Product(s)").

142.    One or more Akamai subsidiaries and/or affiliates used the Akamai '273 Products in regular business operations.

143.    By testing and using products and services for transferring data from a sender to a receiver in a communication network, including but not limited to the Akamai '273 Products, Akamai injured Plaintiff and is liable to Plaintiff for directly infringing one or more claims of the '273 Patent, including at least claims 1-14, pursuant to 35 U.S.C. § 271(a).  A detailed description as to why the Akamai '273 Products infringe at least claims 1-14 of the '273 Patent can be found in the chart attached hereto as Exhibit 8.

144.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '273 Patent.  "[C]ompliance [with § 287's marking requirement] is achieved, factually, by [OptiMorphix] doing nothing at all" because OptiMorphix has, at all times in this action, only asserted method claims of the patents-in-suit, including the '273 Patent.  *Express Mobile, Inc. v. Liquid Web, LLC*, 2019 U.S. Dist. LEXIS 64362, at *4-5 (D. Del. April 15, 2019).  That the '273 Patent also includes system claims does not impose marking obligations on OptiMorphix.  *See Sipco, LLC v. Aruba Networks, LLC*, 2021 U.S. Dist. LEXIS 107916, at *7-8 (D. Del. June 9, 2021) (Noreika, J.) ("Defendants provide no authority stating that the marking requirement applies when there is merely a possibility that a patentee will assert a non-method claim.").  Accordingly, OptiMorphix is not required to mark any product.  However, even if OptiMorphix were obligated to mark any product, OptiMorphix has satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '273 Patent.

145. As a result of Akamai's infringement of the '273 Patent, Plaintiff has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Akamai's infringement, but in no event less than a reasonable royalty for the use made of the invention by Akamai together with interest and costs as fixed by the Court.

<div align="center">

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 9,275,167**

</div>

146. Plaintiff references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

147. Akamai tests and uses in the United States products for rendering a webpage.

148. Akamai tests and uses Akamai's content delivery network ("CDN") platform, including its distributed edge computing infrastructure (the "Akamai Network") (the "Akamai '167 Product(s)"). The following functionalities embedded in the Akamai '167 Product result in uses of the Akamai '167 Product that infringe the '167 Patent: Akamai ION; EdgeWorkers (including the html-rewriter module and the Device Object API); EdgeKV; Property Manager; Device Characterization; Mobile Detect and Redirect; and Adaptive Acceleration.

149. One or more Akamai subsidiaries and/or affiliates use the Akamai '167 Product in regular business operations.

150. Akamai has directly infringed and continues to directly infringe the '167 Patent by using technology for rendering a webpage, including but not limited to the Akamai '167 Product.

151. The Akamai '167 Product is available to businesses and individuals throughout the United States.

152. The Akamai '167 Product is provided to businesses and individuals located in this District.

153. By testing and using products and services comprising a method of rendering a webpage, including but not limited to the Akamai '167 Product, Akamai has injured Plaintiff and is liable to Plaintiff for directly infringing one or more claims of the '167 Patent, including at least claims 1, 2, 6-15, 19, and 25-29, pursuant to 35 U.S.C. § 271(a). A detailed description as to why the Akamai '167 Product infringes at least claims 1, 2, 6-15, 19, and 25-29 of the '167 Patent can be found in the chart attached hereto as Exhibit 9.

154. Since initiation of the present action, Akamai has and continues to indirectly infringe the '167 Patent by actively inducing infringement under 35 U.S.C. § 271(b).

155. Akamai has had knowledge of the '167 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '167 Patent and knew of its infringement, including by way of this lawsuit.

156. Akamai intended to induce patent infringement by third-party customers and users of the Akamai '167 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement. Akamai specifically intended and was aware that the normal and customary use of the accused products would infringe the '167 Patent. Akamai performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '167 Patent and with the knowledge that the induced acts would constitute infringement. For example, Akamai provides the Akamai '167 Product that have the capability of operating in a manner that infringe one or more of the claims of the '167 Patent, including at least claims 1, 2, 6-15, 19, and 25-29, and Akamai further provides documentation and training materials that cause customers and end users of the Akamai '167 Product to utilize the products in a manner that directly infringe one or more claims of the

'167 Patent.[14]  By providing instruction and training to customers and end-users on how to use the Akamai '167 Product in a manner that directly infringes one or more claims of the '167 Patent, including at least claims 1, 2, 6-15, 19, and 25-29, Akamai specifically intended to induce infringement of the '167 Patent.  Akamai engaged in such inducement to promote the sales of the Akamai '167 Product, e.g., through Akamai user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '167 Patent.  Accordingly, Akamai has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '167 Patent, knowing that such use constitutes infringement of the '167 Patent.

157.    The '167 Patent is well-known within the industry as demonstrated by multiple citations to the '167 Patent in published patents and patent applications assigned to technology companies and academic institutions.  Moreover, Akamai has had knowledge of the '167 Patent and its infringement thereof since at least the Original Complaint in this action was served on Akamai or shortly thereafter.  Despite this knowledge, Akamai is utilizing the technology claimed in the '167 Patent without paying a reasonable royalty.  Akamai's infringement of the '167 Patent after the initiation of the present action is best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

158.    To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '167 Patent.  Akamai was notified of its infringement of the '167 Patent since

---

[14] *See, e.g.*, *Dynamic Content Assembly using the html-rewriter*, AKAMAI TECHDOCS, *available at*: https://techdocs.akamai.com/edgeworkers/docs/html-rewriter-dynamic-content-assembly    (last visited March 2025); *Akamai ION Product Page,* AKAMAI WEBSITE, *available at*: https://www.akamai.com/products/web-performance-optimization (last visited March 2025); *Response    Content    Transformation*,    AKAMAI    TECHDOCS,    *available    at*: https://techdocs.akamai.com/edgeworkers/docs/transform-response-content (last visited March 2025).

at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '167 Patent and knew of its infringement, including by way of this lawsuit. Despite this notice, Akamai continued to infringe thereafter. For clarity, OptiMorphix seeks only damages for Akamai's infringement of the '167 Patent post-dating the Original Complaint.

159. As a result of Akamai's infringement of the '167 Patent, Plaintiff has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Akamai's infringement, but in no event less than a reasonable royalty for the use made of the invention by Akamai together with interest and costs as fixed by the Court.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 10,412,388

160. Plaintiff references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

161. Akamai tests and uses in the United States products comprising technology for video compression using adaptive re-quantization using extracted and derived quantization parameters.

162. Akamai tests and uses Akamai Products and Services that perform H.265 video encoding, including at least the following: Akamai's content delivery network ("CDN") platform, including its distributed edge computing infrastructure (the "Akamai Network") (the "Akamai '388 Product(s)").

163. Akamai tests and uses the Akamai '388 Products that comply with the H.265 video encoding standard.

164. Akamai has directly infringed and continues to directly infringe the '388 Patent by using technology for video compression using adaptive re-quantization using extracted and derived quantization parameters, including but not limited to the Akamai '388 Products.

165. The Akamai '388 Products are available to businesses and individuals throughout the United States.

166. The Akamai '388 Products are provided to businesses and individuals located in this District.

167. By testing and using products and services comprising technology for video compression using adaptive re-quantization using extracted and derived quantization parameters, including but not limited to the Akamai '388 Products, Akamai has injured Plaintiff and is liable to Plaintiff for directly infringing one or more claims of the '388 Patent, including at least claims 1-9 and 11-19, pursuant to 35 U.S.C. § 271(a). A detailed description as to why the Akamai '388 Products infringe at least claims 1-9 and 11-19 of the '388 Patent can be found in the chart attached hereto as Exhibit 10.

168. Since initiation of the present action, Akamai has and continues to indirectly infringe the '388 Patent by actively inducing infringement under 35 U.S.C. § 271(b).

169. Akamai has had knowledge of the '388 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '388 Patent and knew of its infringement, including by way of this lawsuit.

170. Akamai intended to induce patent infringement by third-party customers and users of the Akamai '388 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement. Akamai specifically intended and was aware that the normal and customary use of the accused products would infringe the '388 Patent. Akamai performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '388 Patent and with the knowledge that the induced acts would constitute infringement. For example, Akamai provides the Akamai

'388 Products that have the capability of operating in a manner that infringe one or more of the claims of the '388 Patent, including at least claims 1-9 and 11-19, and Akamai further provides documentation and training materials that cause customers and end users of the Akamai '388 Products to utilize the products in a manner that directly infringe one or more claims of the '388 Patent.[15]  By providing instruction and training to customers and end-users on how to use the Akamai '388 Products in a manner that directly infringes one or more claims of the '388 Patent, including at least claims 1-9 and 11-19, Akamai specifically intended to induce infringement of the '388 Patent.  Akamai engaged in such inducement to promote the sales of the Akamai '388 Products, e.g., through Akamai user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '388 Patent. Accordingly, Akamai has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '388 Patent, knowing that such use constitutes infringement of the '388 Patent.

171.    The '388 Patent is well-known within the industry as demonstrated by multiple citations to the '388 Patent in published patents and patent applications assigned to technology companies and academic institutions.  Moreover, Akamai has had knowledge of the '388 Patent and its infringement thereof since at least the Original Complaint in this action was served on Akamai or shortly thereafter.  Despite this knowledge, Akamai is utilizing the technology claimed in the '388 Patent without paying a reasonable royalty.  Akamai's infringement of the '388 Patent

---

[15] *See, e.g.*, *Akamai Image and Video Manager - Supported Image and Video Formats,* AKAMAI TECHDOCS, *available at*: https://techdocs.akamai.com/ivm/docs/supported-image-and-video-formats (last visited March 2025); *OTT on Cloud Transcoding*, Akamai Documentation, *available at*: https://www.akamai.com/site/en/documents/ebook/ott-on-cloud-transcoding.pdf (last visited March 2025).

after the initiation of the present action is best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

172. To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '388 Patent. Akamai was notified of its infringement of the '388 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '388 Patent and knew of its infringement, including by way of this lawsuit. Despite this notice, Akamai continued to infringe thereafter. For clarity, OptiMorphix seeks only damages for Akamai's infringement of the '388 Patent post-dating the Original Complaint.

173. As a result of Akamai's infringement of the '388 Patent, Plaintiff has suffered monetary damages, and seek recovery in an amount adequate to compensate for Akamai's infringement, but in no event less than a reasonable royalty for the use made of the invention by Akamai together with interest and costs as fixed by the Court.

## COUNT IV
### INFRINGEMENT OF U.S. PATENT NO. 9,894,361

174. Plaintiff references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

175. Akamai tests and uses in the United States products containing technology for quality-aware video optimization.

176. Akamai tests and uses Akamai Products and Services that perform H.265 video encoding, including at least the following: Akamai's content delivery network ("CDN") platform, including its distributed edge computing infrastructure (the "Akamai Network") (the "Akamai '361 Product(s)").

177. Akamai tests and uses Akamai '361 products that comply with the H.265 video encoding standard.

178. Akamai has directly infringed and continues to directly infringe the '361 Patent by using technology for quality-aware video optimization, including but not limited to the Akamai '361 Products.

179. The Akamai '361 Products are available to businesses and individuals throughout the United States.

180. The Akamai '361 Products are provided to businesses and individuals located in this District.

181. By testing and using products and services comprising technology for quality-aware video optimization, including but not limited to the Akamai '361 Products, Akamai has injured Plaintiff and is liable to Plaintiff for directly infringing one or more claims of the '361 Patent, including at least claims 1-10, 13-21, and 24-25 pursuant to 35 U.S.C. § 271(a). A detailed description as to why the Akamai '361 Products infringe at least claims 1-10, 13-21, and 24-25 of the '361 Patent can be found in the chart attached hereto as Exhibit 11.

182. Since initiation of the present action, Akamai has and continues to indirectly infringe the '361 Patent by actively inducing infringement under 35 U.S.C. § 271(b).

183. Akamai has had knowledge of the '361 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '361 Patent and knew of its infringement, including by way of this lawsuit.

184. Akamai intended to induce patent infringement by third-party customers and users of the Akamai '361 Products and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement. Akamai specifically intended and was aware that the normal and customary use of the accused products would infringe the '361 Patent. Akamai performed the acts that constitute induced infringement,

and would induce actual infringement, with knowledge of the '361 Patent and with the knowledge that the induced acts would constitute infringement.  For example, Akamai provides the Akamai '361 Products that have the capability of operating in a manner that infringe one or more of the claims of the '361 Patent, including at least claims 1-10, 13-21, and 24-25, and Akamai further provides documentation and training materials that cause customers and end users of the Akamai '361 Products to utilize the products in a manner that directly infringe one or more claims of the '361 Patent.[16]  By providing instruction and training to customers and end-users on how to use the Akamai '361 Products in a manner that directly infringes one or more claims of the '361 Patent, including at least claims 1-10, 13-21, and 24-25, Akamai specifically intended to induce infringement of the '361 Patent.  Akamai engaged in such inducement to promote the sales of the Akamai '361 Products, e.g., through Akamai user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '361 Patent.  Accordingly, Akamai has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '361 Patent, knowing that such use constitutes infringement of the '361 Patent.

185.   The '361 Patent is well-known within the industry as demonstrated by multiple citations to the '361 Patent in published patents and patent applications assigned to technology companies and academic institutions.  Moreover, Akamai has had knowledge of the '361 Patent and its infringement thereof since at least the Original Complaint in this action was served on Akamai or shortly thereafter.  Despite this knowledge, Akamai is utilizing the technology claimed

---

[16] *See, e.g.*, *Akamai Image and Video Manager - Supported Image and Video Formats,* AKAMAI TECHDOCS, *available at*: https://techdocs.akamai.com/ivm/docs/supported-image-and-video-formats (last visited March 2025); *OTT on Cloud Transcoding*, Akamai Documentation, *available at*: https://www.akamai.com/site/en/documents/ebook/ott-on-cloud-transcoding.pdf (last visited March 2025).

in the '361 Patent without paying a reasonable royalty.  Akamai's infringement of the '361 Patent after the initiation of the present action is best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

186.   To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '361 Patent.  Akamai was notified of its infringement of the '361 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '361 Patent and knew of its infringement, including by way of this lawsuit. Despite this notice, Akamai continued to infringe thereafter.  For clarity, OptiMorphix seeks only damages for Akamai's infringement of the '361 Patent post-dating the Original Complaint.

187.   As a result of Akamai's infringement of the '361 Patent, Plaintiff has suffered monetary damages, and seek recovery in an amount adequate to compensate for Akamai's infringement, but in no event less than a reasonable royalty for the use made of the invention by Akamai together with interest and costs as fixed by the Court.

<div align="center">

**COUNT V**
**INFRINGEMENT OF U.S. PATENT NO. 9,936,040**

</div>

188.   Plaintiff references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

189.   Akamai tests and uses in the United States products for caching and keying segments for efficient data retrieval.

190.   Akamai tests and uses Akamai's content delivery network ("CDN") platform, including its distributed edge computing infrastructure (the "Akamai Network") (the "Akamai '040 Product(s)").  The following functionalities embedded in the Akamai '040 Product result in uses of the Akamai '040 Product that infringe the '040 Patent: Akamai ION; Akamai Adaptive Media Delivery ("AMD"); Akamai Object Delivery; Akamai Download Delivery; Akamai API

Acceleration; Akamai EdgeWorkers; Akamai EdgeKV; Akamai Media Services Live; and the Akamai Property Manager API.

191. One or more Akamai subsidiaries and/or affiliates use the Akamai '040 Product in regular business operations.

192. Akamai has directly infringed and continues to directly infringe the '040 Patent by using technology for caching and keying segments for efficient data retrieval, including but not limited to the Akamai '040 Product.

193. The Akamai '040 Product is available to businesses and individuals throughout the United States.

194. The Akamai '040 Product is provided to businesses and individuals located in this District.

195. By testing and using products and services for caching and keying segments for efficient data retrieval, including but not limited to the Akamai '040 Product, Akamai has injured Plaintiff and is liable to Plaintiff for directly infringing one or more claims of the '040 Patent, including at least claims 14-22 pursuant to 35 U.S.C. § 271(a). A detailed description as to why the Akamai '040 Product infringes at least claims 14-22 of the '040 Patent can be found in the chart attached hereto as Exhibit 12.

196. Since initiation of the present action, Akamai has and continues to indirectly infringe the '040 Patent by actively inducing infringement under 35 U.S.C. § 271(b).

197. Akamai has had knowledge of the '040 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '040 Patent and knew of its infringement, including by way of this lawsuit.

198.    Akamai intended to induce patent infringement by third-party customers and users of the Akamai '040 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement. Akamai specifically intended and was aware that the normal and customary use of the accused products would infringe the '040 Patent. Akamai performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '040 Patent and with the knowledge that the induced acts would constitute infringement. For example, Akamai provides the Akamai '040 Product that has the capability of operating in a manner that infringe one or more of the claims of the '040 Patent, including at least claims 14-22, and Akamai further provides documentation and training materials that cause customers and end users of the Akamai '040 Product to utilize the product in a manner that directly infringe one or more claims of the '040 Patent.[17] By providing instruction and training to customers and end-users on how to use the Akamai '040 Product in a manner that directly infringes one or more claims of the '040 Patent, including at least claims 14-22, Akamai specifically intended to induce infringement of the '040 Patent. Akamai engaged in such inducement to promote the sales of the Akamai '040 Product, e.g., through Akamai user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '040 Patent. Accordingly, Akamai has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '040 Patent, knowing that such use constitutes infringement of the '040 Patent.

---

[17] *See, e.g.*, *Learn About Akamai's Caching – Akamai Property Manager Guide,* AKAMAI TECHDOCS WEBSITE, *available at*: https://techdocs.akamai.com/property-mgr/docs/know-caching (last visited March 2025); *Caching – Akamai API Definitions,* AKAMAI TECHDOCS WEBSITE, *available at*: https://techdocs.akamai.com/api-definitions/docs/caching (last visited March 2025).

199. The '040 Patent is well-known within the industry as demonstrated by multiple citations to the '040 Patent in published patents and patent applications assigned to technology companies and academic institutions. Moreover, Akamai has had knowledge of the '040 Patent and its infringement thereof since at least the Original Complaint in this action was served on Akamai or shortly thereafter. Despite this knowledge, Akamai is utilizing the technology claimed in the '040 Patent without paying a reasonable royalty. Akamai's infringement of the '040 Patent after the initiation of the present action is best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

200. To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '040 Patent. "[C]ompliance [with § 287's marking requirement] is achieved, factually, by [OptiMorphix] doing nothing at all" because OptiMorphix has, at all times in this action, only asserted method claims of the patents-in-suit, including the '040 Patent. *Express Mobile, Inc. v. Liquid Web, LLC*, 2019 U.S. Dist. LEXIS 64362, at *4-5 (D. Del. April 15, 2019). That the '040 Patent also includes system claims does not impose marking obligations on OptiMorphix. *See Sipco, LLC v. Aruba Networks, LLC*, 2021 U.S. Dist. LEXIS 107916, at *7-8 (D. Del. June 9, 2021) (Noreika, J.) ("Defendants provide no authority stating that the marking requirement applies when there is merely a possibility that a patentee will assert a non-method claim."). Accordingly, OptiMorphix is not required to mark any product. However, even if OptiMorphix were obligated to mark any product, OptiMorphix has satisfied the requirements of 35 U.S.C. § 287(a) with respect to the '040 Patent.

201. As a result of Akamai's infringement of the '040 Patent, Plaintiff has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Akamai's

infringement, but in no event less than a reasonable royalty for the use made of the invention by Akamai together with interest and costs as fixed by the Court.

## COUNT VI
## INFRINGEMENT OF U.S. PATENT NO. 9,167,021

202. Plaintiff references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

203. Akamai tests and uses in the United States products comprising technology for HTTP transaction analysis for web browsing session segmentation.

204. Akamai tests and uses Akamai mPulse (the "Akamai '021 Product(s)").

205. One or more Akamai subsidiaries and/or affiliates use the Akamai '021 Product in regular business operations.

206. Akamai has directly infringed and continues to directly infringe the '021 Patent by using technology comprising HTTP transaction analysis for web browsing session segmentation, including but not limited to the Akamai '021 Product.

207. The Akamai '021 Product is available to businesses and individuals throughout the United States.

208. The Akamai '021 Product is provided to businesses and individuals located in this District.

209. By testing and using products and services comprising technology for HTTP transaction analysis for web browsing session segmentation, including but not limited to the Akamai '021 Product, Akamai has injured Plaintiff and is liable to Plaintiff for directly infringing one or more claims of the '021 Patent, including at least claims 1-8, 15-22, 29-36, and 43 pursuant to 35 U.S.C. § 271(a). A detailed description as to why the Akamai '021 Product infringes at least

claims 1-8, 15-22, 29-36, and 43 of the '021 Patent can be found in the chart attached hereto as Exhibit 13.

210. Since initiation of the present action, Akamai has and continues to indirectly infringe the '021 Patent by actively inducing infringement under 35 U.S.C. § 271(b).

211. Akamai has had knowledge of the '021 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '021 Patent and knew of its infringement, including by way of this lawsuit.

212. Akamai intended to induce patent infringement by third-party customers and users of the Akamai '021 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement. Akamai specifically intended and was aware that the normal and customary use of the accused products would infringe the '021 Patent. Akamai performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '021 Patent and with the knowledge that the induced acts would constitute infringement. For example, Akamai provides the Akamai '021 Product that have the capability of operating in a manner that infringe one or more of the claims of the '021 Patent, including at least claims 1-8, 15-22, 29-36, and 43, and Akamai further provides documentation and training materials that cause customers and end users of the Akamai '021 Product to utilize the products in a manner that directly infringe one or more claims of the '021 Patent.[18] By providing instruction and training to customers and end-users on how to use the

---

[18] *See, e.g., How mPulse Works – Akamai mPulse Guide*, AKAMAI TECHDOCS, *available at*: https://techdocs.akamai.com/mpulse/docs/how-mpulse-works (last visited March 2025); *mPulse OSS Boomerang Class,* AKAMAI GITHUB REPOSITORY, *available at*: https://akamai.github.io/boomerang/oss/BOOMR.plugins.SPA.html (last visited March 2025); *mPulse API – Send A Beacon,* AKAMAI TECHDOCS, *available at*: https://techdocs.akamai.com/mpulse/reference/post-beacons (last visited March 2025); *Pulse API*

Akamai '021 Product in a manner that directly infringes one or more claims of the '021 Patent, including at least claims 1-8, 15-22, 29-36, and 43, Akamai specifically intended to induce infringement of the '021 Patent. Akamai engaged in such inducement to promote the sales of the Akamai '021 Product, e.g., through Akamai user manuals, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '021 Patent. Accordingly, Akamai has induced and continues to induce users of the accused products to use the accused products in their ordinary and customary way to infringe the '021 Patent, knowing that such use constitutes infringement of the '021 Patent.

213.   The '021 Patent is well-known within the industry as demonstrated by multiple citations to the '021 Patent in published patents and patent applications assigned to technology companies and academic institutions. Moreover, Akamai has had knowledge of the '021 Patent and its infringement thereof since at least the Original Complaint in this action was served on Akamai or shortly thereafter. Despite this knowledge, Akamai is utilizing the technology claimed in the '021 Patent without paying a reasonable royalty. Akamai's infringement of the '021 Patent after the initiation of the present action is best described as willful, wanton, malicious, in bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate.

214.   To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '021 Patent. Akamai was notified of its infringement of the '167 Patent since at least the Original Complaint in this action was served on Akamai or shortly thereafter, and Akamai knew of the '021 Patent and knew of its infringement, including by way of this lawsuit.

---

–   *Get Timers And Metrics,* AKAMAI TECHDOCS, *available at*: https://techdocs.akamai.com/mpulse/reference/get-timers-metrics (last visited March 2025).

Despite this notice, Akamai continued to infringe thereafter.  For clarity, OptiMorphix seeks only damages for Akamai's infringement of the '021 Patent post-dating the Original Complaint.

215.    As a result of Akamai's infringement of the '021 Patent, Plaintiff has suffered monetary damages, and seek recovery in an amount adequate to compensate for Akamai's infringement, but in no event less than a reasonable royalty for the use made of the invention by Akamai together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff OptiMorphix, Inc. respectfully requests that this Court enter:

A.    A judgment in favor of Plaintiff that Akamai has infringed, either literally and/or under the doctrine of equivalents, the '273, '167, '388, '361, '040, and '021 Patents;

B.    An award of damages resulting from Akamai's acts of infringement in accordance with 35 U.S.C. § 284;

C.    A judgment and order finding that Akamai's infringement of the '167, '388, '361, '040, and '021 Patents after the initiation of the present action was willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate within the meaning of 35 U.S.C. § 284 and awarding to Plaintiff enhanced damages;

D.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Plaintiff reasonable attorneys' fees against Akamai;

E.    Any and all other relief to which Plaintiff may show themselves to be entitled.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff OptiMorphix, Inc.

requests a trial by jury of any issues so triable by right.

Dated:  April 28, 2026                                BAYARD, P.A.


OF COUNSEL:                                           /s/ Stephen B. Brauerman
                                                      Stephen B. Brauerman (No. 4952)
Dorian S. Berger                                      Ronald P. Golden III (No. 6254)
Daniel P. Hipskind                                    600 N. King Street, Suite 400
Erin E. McCracken                                     P.O. Box 25130
BERGER & HIPSKIND LLP                                 Wilmington, Delaware 19801
9538 Brighton Way, Ste. 320                           (302) 655-5000
Beverly Hills, CA 90210                               sbrauerman@bayardlaw.com
Telephone: 323-886-3430                               rgolden@bayardlaw.com
Facsimile: 323-978-5508
E-mail: dsb@bergerhipskind.com                        *Attorneys for Plaintiff*
E-mail: dph@bergerhipskind.com                        *OptiMorphix, Inc.*
E-Mail: eem@bergerhipskind.com